**Affirmed and Opinion filed August 1, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-17-00850-CV

## WATAMAR HOLDING S.A., Appellant

### V.

## SFM HOLDINGS, S.A., SOLLY LAWI, & ALBERT LAWI, Appellees

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-30636**

## OPINION

This is an interlocutory appeal[1] from an order sustaining nonresident defendants SFM Holdings, S.A. ("SFM"), Solly Lawi, and Albert Lawi's (collectively "nonresident defendants") objections to jurisdiction and special appearances and dismissing nonresident defendants for want of jurisdiction. In its

---

[1] *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(7) (authorizing appeal from interlocutory order that "grants or denies the special appearance of a defendant under Rule 120a, Texas Rules of Civil Procedure[.]").

sole issue on appeal, appellant Watamar Holding, S.A. ("Watamar") contends that the trial court erred in granting the special appearances and in sustaining objections to an exhibit Watamar submitted in response to the special appearances. We affirm.

## I.    Background

Watamar is a company incorporated under the laws of the Republic of Panama. In 1981, Watamar acquired a 10% interest in the Mirelis group of companies (known as the "Mirelis Group") which included Société Financierè Mirelis, S.A. (founded in 1949 in Geneva, Switzerland) which is presently SFM Holdings, S.A., (a Swiss company), and Mirelis Investments, Ltd. (established in 1957 in Montreal, Canada) which is presently Mirelis Investment Properties, Inc. (a Canadian corporation). The Mirelis Group owns numerous real properties and itself has ownership interests in third party entities that own real properties all over the world.

None of the appellees are residents of the State of Texas. SFM is organized under the laws of Switzerland with its principal place of business in Geneva, Switzerland. Solly Lawi is a Canadian citizen who resides in Geneva. Albert Lawi is a Canadian citizen who resides in Geneva.

Watamar alleges in its Fourth Amended Petition that around 1997 it decided to liquidate its ownership interest in the Mirelis Group. As alleged, in 1998, Watamar entered a contract for the sale of that interest called the "Agreement of Sale of Financial Interests and Real Estate Call Options" (identified by Watamar as the "1998 Agreement"). The 1998 Agreement purportedly[2] stipulated the sale of

---

[2] Information alleged in Watamar's Fourth Amended Petition is included for background purposes. As set forth in greater detail below, the court sustained objections to the use of the 1998 Agreement as an exhibit to Watamar's response to special exceptions on the grounds that it it was not properly authenticated as required by Rule 1009 of the Texas Rules of Evidence

2

Watamar's 10% holding interest in the Mirelis Group covering two elements: 1) the sale of its financial interest held in Mirelis Group Finance companies; and 2) the sale of its interest in Mirelis Group-held participations in real estate investments (the "Mirelis Group Real Estate Investments"), subject to a buyback or call option. The 1998 Agreement was signed in Geneva, with a clause choosing Swiss law, and a clause providing for arbitration in Switzerland, subject to change of venue only at the discretion of the arbitral tribunal.

A dispute arose regarding the exact value of Watamar's 10% interest in the Mirelis Group Real Estate Investments. Watamar exercised its call option in June 2003 and, pursuant to the requirements of the 1998 Agreement, the parties entered into arbitration in Switzerland in April 2005.[3] At the time of the arbitration, only some of the 29 real properties had been sold. After five years in arbitration, in 2010, Watamar was awarded monetary compensation for 16 properties that had been sold. In addition, Watamar was awarded a 10% *pro rata* percentage of interest in the 13 unsold properties. One of the 13 properties that had not been sold, the Ashford Willowbrook Property, is located in Houston, Harris County, Texas, and forms the basis of this lawsuit.

In 2012, the parties entered a second arbitration in Switzerland to resolve how to transfer the *pro rata* percentage of the real property interests to Watamar, because some of the unsold properties were majority-held by third parties, who would not agree to transfer the awarded percentages or were not directly owned by

---

("Translating a Foreign Language Document").

[3] Although Watamar complains in its reply brief that appellees improperly rely on information outside the record, including "(a) facts relating to the history and course of performance of the 1998 Agreement . . . (b) facts relating to earlier arbitrations between the parties . . . and (c) facts pertaining to the inclusion of the Texas properties in the 1998 Agreement," Watamar does not dispute the facts. To the extent such facts are included in the background portion of our opinion, they do not form the basis of our decision.

the Mirelis Group (*i.e.*, the Mirelis Group only had an ownership interest in the third-party entities that owned the real property). In 2014, the arbitrator determined that Watamar could not obtain a direct interest in those properties if the third-party owners would not agree to the transfer. Thus, Watamar received monetary compensation for the estimated value of those real estate interests as opposed to a direct ownership interest in the real properties. Ashford Willowbrook Property was a property where the Mirelis Group had ownership in a third-party entity but did not have a direct ownership in the property. In relation to Ashford Willowbrook Property, Watamar received $27,640.00 for its previously awarded 2.764% interest in the property.

In May 2015, Watamar filed suit allegedly seeking to obtain accurate financial information pertaining to its real estate investments in Texas and to enforce its contractual rights to purchase property located in Harris County, Texas. In its Fourth Amended Petition, Watamar requested the remedy of specific performance of contract, constructive trust, and injunctive relief. Watamar asserted claims for breach of contract, breach of fiduciary duty, unjust enrichment, an accounting, and money had and received. Watamar alleged the vicarious liability theories of aiding and abetting breach of fiduciary duty, civil conspiracy to breach fiduciary duty, joint venture, and piercing the corporate veil. Watamar requested an award of attorney fees pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

While several defendants conceded jurisdiction, others did not.[4] On February 14, 2016, nonresident defendants SFM, Solly Lawi, and Albert Lawi filed

---

[4] Defendants Ashford Willowbrook, Ashford Development, Mirlaw, First Southern Charter Joint Venture, and First Southern/Ashford Joint Venture ("general appearance defendants") conceded that jurisdiction is appropriate and filed general appearances.

4

special appearances with supporting affidavits.[5] Following the filing of the special appearance, the parties agreed to postpone any hearing on special appearance issues until Watamar had an opportunity to conduct discovery on jurisdictional issues.

After the completion of the jurisdictional discovery, on April 28, 2017, the nonresident defendants filed a brief in support of their special appearances. In addition, a notice of oral hearing was filed and the hearing set for May 8, 2017. The hearing was postponed and subsequently reset for June 12, 2017.

On June 9, 2017, Watamar filed its response to the special appearances by the nonresident defendants. Attached to Watamar's response as Exhibit A is, according to Watamar, an English translation of the "1998 Agreement." The 1998 Agreement is written in a language other than English. Though the parties do not specify which language, the record indicates that the 1998 Agreement is written in French.

On June 12, 2017, the nonresident defendants filed their objection to Exhibit A of Watamar's response to the special appearances, pursuant to Rule 1009 of the Texas Rules of Evidence. The nonresident defendants argued that Exhibit A was inadmissible because it did not comply with Rule 1009(a), based on Watamar's failure to serve a copy of the 1998 Agreement (written in French) and failure to provide an affidavit from a qualified translator certifying the accuracy of the translation of the 1998 Agreement submitted by Watamar. On June 12, 2017, a hearing was conducted on the special appearances and the objection to Exhibit A was raised during the hearing.

---

[5] Nonresident defendants Eva Lawi, Mireille Zilkha, Olga Levy, Joyce Peress, and Dianne Turcan also filed special appearances. After jurisdictional discovery, Watamar filed its fourth amended petition, which did not include these individuals as defendants. They are not parties to this appeal.

On October 6, 2017, the trial court sustained the nonresident defendants' objection to Exhibit A. Additionally, on October 6, 2017, in an Order Sustaining Objection to Jurisdiction, the trial court granted the special appearances for the nonresident defendants SFM, Solly Lawi, and Albert Lawi and dismissed all claims against them for want of personal jurisdiction.

Watamar timely filed this interlocutory appeal.

## II.  Special Appearance:  standard of review and relevant law

### A.  Standard of review.

Whether a court has personal jurisdiction over a defendant is a question of law. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 805–06 (Tex. 2002). The trial court's decision to grant or deny a special appearance is subject to *de novo* review on appeal. *Id*. at 806. However, the trial court's factual findings supporting its ruling on the special appearance may be challenged for legal and factual sufficiency. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When, as here, the trial court did not issue findings of fact, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's ruling. *Id*.

When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *Id*. at 827. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id*. The fact finder is the sole judge of witness credibility and the weight to give their testimony. *See id*. at 819.

6

In a factual-sufficiency review, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 407. We may not substitute our own judgment for that of the trier of fact or pass upon the credibility of the witnesses. *Id.* The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Yeng v. Zou*, 407 S.W.3d 485, 489 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

## B.     Special appearance law.

Texas courts may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). Under the Texas long-arm statute, the plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). When the plaintiff meets this initial burden, the burden shifts to the defendant to negate all potential bases for personal jurisdiction pleaded by the plaintiff. *Id.* The Texas long-arm statute extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit. *Marchand*, 83 S.W.3d at 795.

Personal jurisdiction over a nonresident defendant is constitutional when two conditions are satisfied: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Marchand*, 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully

7

avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Moki Mac*, 221 S.W.3d at 575. There are three factors relevant to a purposeful-availment inquiry: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied on must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage or profit by "availing" itself of the jurisdiction. *Id*. This three-part inquiry assesses the quality and nature of the contacts, not the quantity. *Retamco*, 278 S.W.3d at 339. A defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there. *Moki Mac*, 221 S.W.3d at 575. At its core, the purposeful-availment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 152 (Tex. 2013).

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction.[6] *Marchand*, 83 S.W.3d at 795–96. When specific jurisdiction is alleged, as here, we focus the minimum-contacts analysis on the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76. Specific jurisdiction is established if the defendant's alleged liability arises out of or is related to an activity conducted within the forum. *Id*. at 576; *Marchand*, 83 S.W.3d at 796. For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585.

---

[6] Watamar does not seek to establish personal jurisdiction based on general jurisdiction.

8

## III.    Evidentiary Issues

On appeal, we must determine what evidence the trial court considered in ruling on the special appearances.  *See Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878, 884 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[W]e consider all of the evidence before the trial court on the question of [personal] jurisdiction.").

### A.    Exhibit A to Watamar's response to the special appearances.[7]

On June 12, 2017, the nonresident defendants filed their objection to Exhibit A of Watamar's response to the special appearances pursuant to Rule 1009 of the Texas Rules of Evidence, because the exhibit offered was a translation of a document written in a foreign language.  The nonresident defendants argued that Watamar neither served a copy of the 1998 Agreement (written in French) nor provided an affidavit from a qualified translator certifying the accuracy of the translation of the 1998 Agreement submitted by Watamar. Thus, the nonresident defendants asserted that Exhibit A was not in compliance with Rule 1009(a) and was therefore inadmissible.  As set forth above, the trial court sustained the nonresident defendants' objection to Exhibit A.

In its notice of appeal, Watamar challenges the trial court's order granting the special appearances "(and, to the extent necessary, the Order of the Court signed October 6, 2017 sustaining objections to Plaintiff's Exhibit A submitted in response to the special appearances)."  In its appellate brief, Watamar does not explicitly challenge the trial court's evidentiary ruling on the nonresident defendants' objection to Exhibit A.  In its sole appellate issue, Watamar asserts that the trial court erred in granting the nonresident defendants' special appearances. An appellant's brief must concisely state all issues presented for review.  Tex. R.

---

[7] Watamar attached the same document to its Fourth Amended petition.

App. P. 38.1(f). The statement of an issue will be treated as covering every subsidiary question that is fairly included. *Id.*

The Texas Supreme Court has emphasized that we must construe issues presented liberally to obtain a just, fair, and equitable adjudication of the rights of the litigants. *Perry v. Cohen,* 272 S.W.3d 585, 588 (Tex. 2008). In its brief, Watamar does not assert that the trial court erred in sustaining the objection to Exhibit A, nor does Watamar attack the basis for this court's ruling. Even under a liberal construction of Watamar's brief, we conclude that Watamar has not assigned error as to this ruling of the trial court. *See id.* (holding that court of appeals erred by concluding appellant failed to assign error as to special-exceptions order because, under a reasonable yet liberal construction of appellant's brief, appellant challenged this order given that appellant presented argument challenging the basis of this order, though appellant did not expressly challenge the order); *Emerson v. Emerson*, 559 S.W.3d 727, 736 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Accordingly, we need not and do not address the trial court's order sustaining the nonresidents' objection to the nonresident defendants' Exhibit A. *See Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986) (holding that "the court of appeals may not reverse a trial court's judgment in the absence of properly assigned error"). Consequently, we are precluded from considering Exhibit A in the analysis of this case.

## B. Letter dated March 25, 2013.

In regard to special appearances, Rule 120a(3) of the Texas Rules of Civil Procedure provides, in pertinent part:

> The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony.

10

Tex. R. Civ. P. 120a(3). Here, the reporter's record contains two volumes of sealed exhibits that were made part of the special appearance hearing conducted on June 12, 2017. The sealed exhibits are deposition excerpts from four individuals. The clerk's record and supplemental record also contain pleadings, affidavits, and briefing by the parties.

In its brief, Watamar references a March 25, 2013, letter by attorney Alain B. Levy as evidence of personal jurisdiction. Watamar's brief, however, does not comply with Texas Rule of Appellate Procedure 38.1(i) requiring that an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." *See* Tex. R. App. P. 38.1(i). Rather, the nonresident defendants attach the letter, together with an authentication of translation, as an exhibit to their brief. With exceptions not applicable in this case, the rule is that documents attached to an appellate brief which are not part of the record may not be considered by the appellate court. *See WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 465 n.23 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("we cannot consider documents attached as appendices to briefs and must consider a case based solely upon the record filed"); *cf. Dallas Mkt. Ctr. v. The Swing, Inc.*, 775 S.W.2d 838, 842 (Tex. App.—Dallas 1989, no writ) ("At the very most, the exhibits that were tendered to this Court, absent a showing that they were properly offered into evidence and that the trial court admitted them into evidence during trial, are loose exhibits, forming no part of the record proper."). The appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record. Tex. R. App. P. 34.1. The letter was not part of the special-appearance evidence, and therefore is not part of the trial record on appeal. *Nguyen v. Intertex, Inc.*, 93 S.W.3d 288, 293 (Tex.

11

App.—Houston [14th Dist.] 2002, no pet.). Accordingly, we will not consider any documents attached to appellees' brief which are not part of the appellate record.

## IV. SFM's, Solly Lawi's, and Albert Lawi's special appearances

Watamar contends the "trial court erred in granting Defendants-Appellees' SFM Holdings, Albert Lawi and Solly Lawi's special appearances." Watamar relies exclusively on specific jurisdiction. Thus, we focus the minimum contacts analysis on the "relationship among the defendant, the forum[,] and the litigation." *Moki Mac*, 221 S.W.3d at 575–76. In other words, the nonresident defendants must have purposely availed themselves of the privilege of conducting activities in Texas, and Watamar's cause of action must arise from or relate to those activities. *See DENSP Corp. v. Hall*, 396 S.W.3d 681, 690 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

## A. The trial court lacks specific jurisdiction over SFM.

Watamar argues it was foreseeable that SFM could be made to litigate in Texas because nonresident defendant SFM purposefully availed itself of the privileges of conducting business in Texas. We disagree.

First, Watamar argues that personal jurisdiction can be established over SFM based on its contacts with Texas *vis-à-vis* the 1998 Agreement. According to Watamar, SFM was a signatory and guarantor of the 1998 Agreement. Watamar argues "the Special Appearance Defendants willingly and purposely entered into a contract with Watamar ("1998 Agreement") that expressly relates to Texas properties, including the Ashford Willowbrook Property that is a subject of this lawsuit." However, the nonresident defendants' objection to the 1998 Agreement was sustained by the trial court, and the 1998 Agreement was not part of the special-appearance evidence. This document is not before us on appeal.

12

Watamar's reliance on this exhibit as the basis for specific jurisdiction is unavailing.

Next, Watamar maintains that the letter dated March 25, 2013, signed by Alain B. Levy, external counsel for the nonresident defendants, is evidence that the nonresident defendants were controlling and directing the Ashford Willowbrook Property. Watamar claims Levy sent the letter confirming the agreement among the parties for the sale of the Ashford Willowbrook Property to Watamar. As explained above, this letter is not part of the record before us. Watamar cannot rely upon its contents to establish specific jurisdiction.

The record evidence does demonstrate that SFM is a corporation, organized under the laws of Switzerland, with its principal place of business in Geneva, Switzerland. SFM operates solely as a holding company, which entails supervising and receiving information on various investments.

The record further reveals that Albert Lawi testified as the corporate representative for SFM. He is a manager of SFM as are two other managers. Albert Lawi is also a 14% shareholder of SFM. The board members of SFM are Solly Lawi, Solly Alain Lawi, Alain Bruno Levy, and Jouri Lawi (recently deceased). The record evidence does not demonstrate that any of the managers or members of the board of directors reside in Texas or the United States.

The record evidence shows that there is no direct or even close connection between SFM and the Texas properties at issue in this case. SFM owns 100% of Mirelis Investment Properties, Inc. ("Mirelis Investments"), a Canadian entity. The president of Mirelis Investments is an individual named Solly Karkoukly, who is not a party to this lawsuit. Mirelis Investments owns 50% of Mirlaw Investments, Ltd. ("Mirlaw"), which is also a Canadian entity. The remaining 50 percent of Mirlaw is owned by Mayer Lawee and Alfred Lawee, neither of which

13

have been named in this suit. Mirlaw owns 100% of Ashford Development, Inc. Ashford Development, Inc. owns Ashford Willowbrook, Inc., a Texas corporation. Ashford Willowbrook, Inc. entered into a joint venture called First Southern Charter Joint Venture, in which Ashford Willowbrook, Inc. owns 50 percent. First Southern Charter Joint Venture owns the Ashford Willowbrook Property in Texas. It is through this extensive chain of parents and partially-owned subsidiaries that Watamar seeks to confer Texas jurisdiction over SFM. Albert Lawi, in his capacity as the corporate representative, testified SFM "has not received any benefit directly or indirectly from the Ashford Willowbrook USA property . . . ."

Eveline Barone is the bookkeeper for SFM. Barone does not have access to any subsidiary entity's bank records. SFM does not have a process by which it approves transactions by its subsidiaries. Albert Lawi further testified, "[e]ach [subsidiary] entity is run independently, and they make their own decisions."

Moreover, the evidence before the trial court demonstrates SFM does not have any loans from a U.S. entity, and has never received loans from a U.S. bank. SFM does not have any bank accounts in the United States. The record does not reveal evidence that SFM ever sought business in Texas, marketed in Texas, or owned property in Texas. As shown by the record, SFM has never had bank accounts in Texas, paid taxes in Texas, or received any kind of direct benefit from the ownership of real estate in Texas. Finally, the record does not contain evidence that SFM ever entered into a contract with any Texas entity.

In short, the evidence before the trial court reveals that the only connection from SFM to Texas is through its ownership interest in Mirelis Investment Properties Inc.— a Canadian entity—that is a part of a corporate ownership chain that includes at least four other entities down the ladder, one of which has a partial ownership in the property. The record does not contain evidence of contacts with

the State of Texas. The record does not contain evidence that any of Watamar's claims substantially relate to contacts of SFM with Texas. Based on the record, the trial court did not err in holding that SFM did not purposefully avail itself of the privilege of conducting business in Texas.

**B.    The trial court lacks specific jurisdiction over Solly Lawi and Albert Lawi.**

**1.    Solly Lawi.**

Watamar argues that Solly Lawi's "direct contacts with Texas—in particular, his contacts with Texas stemming from the 1998 Agreement and the 2013 agreement to sell the Ashford Willowbrook Property—render him subject to the jurisdiction of Texas. According to Watamar, Solly Lawi served as the "architect of the 1998 Agreement" and signed it as a guarantor. Watamar further alleges that in 2013 Solly Lawi approved the sale of Ashford Willowbrook "as evidenced by his testimony that he approved the contents of a letter drafted by Alain Bruno Levy . . . ." As set forth above, neither the 1998 Agreement nor the 2013 letter were part of the special-appearance evidence, thus, Watamar's reliance upon these documents to form the basis for specific jurisdiction over Solly Lawi is misplaced.

The evidence admitted by the trial court demonstrates that Solly Lawi is a Canadian citizen who resides in Geneva, Switzerland. Solly Lawi has never had a U.S. bank account, has never had a beneficial interest in a U.S. bank account, and has never made any guarantees related to the United States. Additionally, Solly Lawi has never paid taxes to the United States. No entity controlled by Solly has ever paid U.S. taxes. Solly Lawi has never come to the United States in his own personal capacity to conduct business or to purchase real estate. In 1997, he visited Texas for the bar mitzvah of his cousin's son but did not conduct any

15

business in Texas during that time. In 1982, he visited his cousin, Mimi Levine, in Texas, and he visited the Texas Medical Center in Houston for a personal health issue. He did not conduct any business while he was in Houston. *See Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016) ("The contacts that establish purposeful availment must be purposeful rather than random, fortuitous, isolated, or attenuated").

Solly Lawi is a fourteen percent (14%) shareholder of SFM. Solly Lawi is also one of the three members of the board of directors of SFM, the other two members being non-defendants. There is no evidence that Solly has personally benefitted from any alleged contacts with Texas. He does not own a controlling percentage of the corporation, he is not the sole board member, and he does not have a role as an executive of the company.

The record does not contain evidence that any of Watamar's claims substantially relate to contacts of Solly Lawi with Texas. Based on the record, the trial court did not err in holding that Solly Lawi did not purposefully avail himself of the privilege of conducting business in Texas.

### 2. Albert Lawi.

Watamar maintains that Albert Lawi has been conducting business in Texas since 1978, when he traveled to Harris County to evaluate the property at issue in this case. Watamar contends that Albert Lawi was involved in the formation of the 1998 Agreement, including assembling the list of properties attached to the agreement. According to Watamar, Albert Lawi approved the March 25, 2013 letter from Levy pertaining to the sale of the property at issue to Watamar. As set forth above, the 1998 Agreement and the 2013 letter were not part of the special-appearance evidence and, thus, Watamar's reliance upon these documents to form the basis for specific jurisdiction over Albert Lawi is misplaced.

16

The evidence shows that Albert Lawi is a Canadian citizen who resides in Geneva, Switzerland. Albert Lawi has no ownership interests in the United States. Albert Lawi has never received any income from U.S. investments, directly or indirectly. Albert Lawi has never paid taxes to the United States. Albert Lawi has never personally entered into a contract with a U.S. resident or U.S. entity. He has never owned a bank account in the United States, never made any guarantees relating to the United States, and never acted in any capacity on behalf of a U.S. entity.

Albert Lawi acknowledges that—in 1978—he accompanied Alfred Lawee, (whose role was to oversee properties and investments of Mirlaw), to visit the Ashford Willowbrook Property. At that time, Albert Lawi was acting in his capacity as an employee of Mirelis Investments Limited Canada; he did not have any business in his individual capacity in evaluating the properties. Additionally, the visit was long before any claim in this case arose and, therefore cannot form the nexus to support Watamar's causes of action now. *See Searcy*, 496 S.W.3d 67. Albert Lawi last visited Texas in 2003 for his cousin's daughter's bat mitzvah. He did not visit any Texas property the subject of this suit during his 2003 visit to Texas.

Moreover, the record reflects that Albert Lawi is a fourteen percent (14%) shareholder and a manager of SFM. He is also a non-executive member of the board of directors for Mirelis Investment Properties, Inc., a Canadian corporation. As a non-executive board member (along with two others) of Mirelis Investments, Albert Lawi testified that he relies on the management of the company to perform certain tasks, such as determining the payment of tax liabilities. Albert Lawi testified that the President of Mirelis Investments is an individual named Solly Karkoukly, and it is Karkoukly that runs, administers, and makes investment

17

decisions on behalf of Mirelis Investments. Albert Lawi has not reviewed any of the tax liabilities of Mirlaw Investments, Ltd.—the 50%-owned Canadian subsidiary of Mirelis Investment Properties, Inc.—and therefore does not know whether Mirlaw has had any U.S. tax liabilities.

The record does not contain evidence that any of Watamar's claims substantially relate to contacts of Albert Lawi with Texas. Based on the record, the trial court did not err in holding that Albert Lawi did not purposefully avail himself of the privilege of conducting business in Texas.

## C. SFM, Albert Lawi, and Solly Lawi are not subject to personal jurisdiction under the alter ego doctrine.

Finally, Watamar contends that personal jurisdiction over the nonresident defendants is appropriate pursuant to an alter ego theory. Watamar contends that the entities and properties at issue in this case are controlled by a select group of individuals, namely, Solly Lawi and Albert Lawi, through the ultimate parent entity, SFM. Thus, Watamar argues that these nonresident defendants are subject to personal jurisdiction in Harris County—not only through their individual contacts with Texas, but for the additional reason that the "general appearance defendants" (*i.e.*, other defendants who have not contested personal jurisdiction) are mere "alter egos" of the special appearance defendants SFM, Albert Lawi, and Solly Lawi. Watamar also maintains the trial court's decision must be "reversed because the court applied an incorrect standard to Plaintiff's alter ego theory of personal jurisdiction."

### 1. Application of the alter ego doctrine is necessary to establish personal jurisdiction over the nonresident defendants.

"Under Texas law, a corporation is presumed to be a separate entity from its officers and shareholders." *Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 267 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The alter

ego doctrine is one basis upon which a court may pierce the corporate veil and bring a shareholder within its jurisdiction. *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 481 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *BMC Software*, 83 S.W.3d at 798). The Supreme Court of Texas has explained that when a party seeks to prove one corporation is an alter ego of another, the elements required to pierce the corporate veil for liability purposes differ from those used for jurisdictional purposes. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 174 (Tex. 2007). Courts use different standards because certain elements necessary to pierce the corporate veil are irrelevant to assessing jurisdictional contacts. *See id.* at 175. "To 'fuse' a parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary." *Id.* (quotation omitted). "The rationale for exercising jurisdiction is that the parent corporation exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction." *Id.* at 173. This court has used the standard for jurisdictional veil-piercing of the corporate veil between a parent company and a subsidiary company to assess jurisdictional veil-piercing between an individual and a corporation. *See Greenfield Energy, Inc. v. Duprey*, 252 S.W.3d 721, 731 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

To determine whether an alter ego relationship exists for jurisdictional purposes, "courts look to the total dealings of the corporation and the individual, including the degree to which corporate and individual property have been kept separate, the amount of financial interest, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Cappuccitti*, 222 S.W.3d at 481. Courts also consider the

19

following as evidence of alter ego status: payment of alleged corporate debt with personal checks or other commingling of funds, representations that the individual will back the corporation financially, the diversion of corporate profits for personal use, and inadequate capitalization. *Id*. at 482. An individual's status as an officer, director, or shareholder of an entity, standing alone, is not enough to support an alter ego finding. *Id.*; *see Zamarron v. Shinko Wire Co., Ltd.*, 125 S.W.3d 132, 142 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Watamar, as the party seeking to pierce the corporate veil for jurisdictional purposes, had the burden to present evidence demonstrating the alter ego relationship. *PHC-Minden, L.P.*, 235 S.W.3d at 175; *BMC Software*, 83 S.W.3d at 798. On appeal, we consider whether based on the special-appearance evidence, the trial court was entitled to find that Watamar did not put on sufficient proof to impute the jurisdictional contacts of the other defendants to SFM, Solly Lawi, and Albert Lawi under the alter ego doctrine. *Wormald v. Villarina*, 543 S.W.3d 315, 322 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

### 2. Watamar has not established that SFM, Solly Lawi, and Albert Lawi are subject to jurisdiction under the alter ego doctrine.

As an initial matter, Watamar contends the trial court erred in applying the wrong alter ego standard. During the hearing on the nonresident defendants' special appearances, the trial court mentioned fraud:

| | |
|---|---|
| MR. GRACIA: | And just briefly on the piercing of the corporate veil, Your Honor, Texas law is well established now. . . the failure to follow corporate formalities, even though there is no evidence of it, is not enough to pierce the corporate veil. There are plenty -- |
| THE COURT: | You have to show fraud. |
| MR. GARCIA: | Excuse me? |

20

| THE COURT: | You to have [sic] show fraud. |
|---|---|
| MR. GARCIA: | That's correct. And -- |
| THE COURT: | Fraud has -- fraud has become pretty much the gold standard. |
| MR. GARCIA: | There is no evidence of fraud here, Your Honor. |

Watamar correctly observes that while fraud may be relevant to piercing the corporate veil for liability purposes, it has no place in assessing contacts to determine jurisdiction. *See PHC-Minden, L.P.*, 235 S.W.3d at 175. Although the trial court made a comment regarding fraud, the trial court stopped short of articulating a ruling. The trial court did not say that it would use fraud as part of the legal standard in determining the jurisdictional alter-ego allegations, and further, the trial court made these statements before its ruling. Where, as here, the trial court did not make findings of fact and conclusions of law, we will infer "all facts necessary to support the judgment supported by evidence." *Moki Mac,* 221 S.W.3d at 574. The trial court's comments do not show any error, and for the reasons set forth below, applying the applicable legal standards to the evidence in this case, the trial court's decision should be affirmed.

Watamar attempts to subject the nonresident defendants to personal jurisdiction by asserting *Cornerstone* as controlling law applicable to the facts of this case. *Cornerstone Healthcare Group Holding, Inc. v. Nautic Mgmt. VI, LP*, 493 SW.3d 65 (Tex. 2016). This case, however, is distinguishable from *Cornerstone*. In *Cornerstone*, the nonresident defendants created entities for the specific purpose of purchasing Texas properties. *See id*. at 72. Here, the entity that actually owns the Ashford Willowbrook Property—the First Southern Charter Joint Venture—was not created by the nonresident defendants. The same is true for Ashford Willowbrook, Ashford Development, Mirlaw, and Mirelis Investment. None of these entities was newly created by the nonresident defendants to

21

consummate any transaction, much less one regarding the Ashford Willowbrook Property. Additionally, in contrast to *Cornerstone*, SFM had no control over the Ashford Willowbrook Property. The nonresident defendants have no means of controlling or even influencing the sale or purchase of the Ashford Willowbrook Property.

Next, in an attempt to pull the nonresident defendants into this case, Watamar looks to defendants Mirelis Investment and Mirlaw, who have generally appeared, and attempts to show a pattern of engaging in "sham" corporate proceedings by emphasizing alleged factors such as overlapping board members, sharing an address for mail, and sharing an accountant. The relevant question, however, is whether the parent corporation exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction. *PHC-Minden, L.P.*, 235 S.W.3d at 173. If the parent exercises such a degree of control, the corporate fiction should be disregarded for jurisdictional purposes. *Id*.

In this case, the evidence fails to demonstrate that the nonresident defendants control the internal business operations and affairs of the subsidiary Mirelis Investment or Mirlaw to a greater degree than normally associated with common ownership and directorship.

The evidence shows that SFM does not have a process by which it approves transactions by its subsidiaries. As Albert Lawi testified, as the corporate representative of SFM, "Each [subsidiary] entity is run independently, and they make their own decisions." There is no evidence of any overlap between the members of the boards of directors of SFM and Mirelis Investment. While one of SFM's managers, Albert Lawi, is on the board of directors of Mirelis Investment, he is a non-executive member.

The nonresident defendants argue that SFM is in Switzerland and does not share a physical or mailing address with Mirelis Investment or Mirlaw, which are both located in Canada. Eveline Barone is the bookkeeper for SFM, but Barone does not work for either Mirelis Investment or Mirlaw. Barone does not have access to any subsidiary entity's bank records.

Mirelis Investment is located in Canada. The president of Mirelis Investment was Solly Karkoukly, who is not a party in this case. It was Karkoukly that ran the day-to-day operations, administered, and made investment decisions on behalf of Mirelis Investment. There is no evidence that Karkoukly had any role with SFM. There is no evidence that Karkoukly has an ownership interest in Mirlaw.

Additionally, Mirlaw is only 50% owned by Mirelis Investment (the other 50% is held by non-parties) and is located in Canada. Although Mirelis Investment is in the same building as Mirlaw, the two entities do not share offices. There is no evidence of any overlap between the members of the boards of directors of SFM and Mirlaw. SFM is not a direct shareholder in Mirlaw.

Lastly, Watamar contends the 1998 Agreement and the March 25, 2013 Levy letter demonstrate inter-relatedness, control, and disregard of separate identities. The documents relied upon, the 1998 Agreement and the March 25, 2013 letter, were not part of the special-appearance evidence and, thus, are not before this court.

The evidence before us does not demonstrate that SFM, Solly Lawi, or Albert Lawi exerts such domination and control over Mirelis Investment or Mirlaw that they do not in reality constitute separate and distinct entities but are one and the same legal person for jurisdictional purposes. *PHC-Minden, L.P.*, 235 S.W.3d at 173; *Wormald*, 543 S.W.3d at 322. Instead, the evidence shows that there is

23

nothing more than typical corporate parental involvement consistent with its investor status. *See PHC-Minden, L.P.*, 235 S.W.3d at 176. Based on the record evidence, the trial court was entitled to find that Watamar did not put on sufficient proof to impute the other defendants' jurisdictional contacts to any of the nonresident defendants. *See Wormald*, 543 S.W.3d at 322. The record contains evidence supporting the trial court's conclusion that it lacks personal jurisdiction over the nonresident defendants, and the trial court did not err in granting their special appearances.

## V.    Conclusion

We affirm the trial court's order sustaining nonresident defendants' objections to jurisdiction and special appearances and dismissing nonresident defendants for want of personal jurisdiction.


/s/    Margaret "Meg" Poissant
Justice



Panel consists of Chief Justice Frost and Justices Spain and Poissant.